UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

REBECCA K. P.H.,[1]

        Plaintiff,

   v.                            Case No. 2:21-cv-3896
                                      Judge Michael H. Watson
COMMISSIONER OF SOCIAL          Magistrate Judge Chelsey M. Vascura
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Rebecca K. P.-H. ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 8). Plaintiff did not file a Reply. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and the Commissioner's decision be **AFFIRMED**.

## I.     BACKGROUND

Plaintiff protectively filed an application for SSI on September 18, 2018, alleging that she became disabled on February 20, 2017. (R. at 11, 569–71, 572–78.) Plaintiff's application was denied initially in July 2019, and upon reconsideration in January 2020. (R. at 460–476, 477,

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

478–94, 495.)  Administrative Law Judge Francine A. Serafin ("the ALJ") subsequently held a telephone hearing on September 10, 2020 (R. at 434–59) and issued an unfavorable determination on September 30, 2020 (R. at 8–28).  The Appeals Council denied Plaintiff's request for review on May 6, 2021 (R. at 1–7), making the ALJ's unfavorable determination final for purposes of judicial review.

In this action, Plaintiff asserts that the following errors require remand: (1) the ALJ erred when finding that Plaintiff's physical impairments were not severe; and (2) the ALJ erred by failing to incorporate limitations found by state agency reviewers into Plaintiff's residual functional capacity ("RFC")[2] determination.  Both allegations of error lack merit.

## II.     THE ALJ'S DECISION

On September 30, 2020, the ALJ issued her determination finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 8–28.)  At step one of the

---

[2] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).

2

sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity since Plaintiff's September 18, 2018 application date.  (R. at 13.)  At step two, the ALJ found that although Plaintiff had "numerous physical complaints" none of her medically determinable physical impairments were severe.  (*Id*.)  The ALJ also found that Plaintiff had the following severe mental impairments: posttraumatic stress disorder (PTSD); anxiety disorder; and major depressive disorder.  (*Id*.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 15.)  Before proceeding to step four, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. However, the claimant must not have work that involves assembly line, production rate pace, or quotas. The claimant is capable of tolerating only a few changes in the work routine defined as three to four changes per workday or shift.

(R. at 17.)

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ then relied on testimony from the VE to conclude at steps four and five that Plaintiff was able to perform her past relevant work as a commercial cleaner and that she could make a successful adjustment to other work that existed in significant numbers in the national economy.  (R. at 21–22.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act since September 18, 2018.  (R. at 23.)

### III.    RELEVANT RECORD EVIDENCE

**A.    Physical Issues**

**1.  Treatment Records**

**a.  GI Issues and Anemia**

The record reflects that Plaintiff had GI issues including esophagitis with strictures, dysphagia, and gastritis.  Plaintiff testified that these issues impaired her ability to eat normally causing her to lose drastic amounts of weight and develop anemia.  (R. at 441–42.)

The record reflects that an EGD done in August of 2016, was negative for strictures.  (R. at 1187.)  On February 20, 2017, an upper GI series resulted in findings that were suggestive of gastritis, but no obvious strictures or mucosal ulcerations were found.  (R. at 1188, 1211.)  Although a modified barium swallow test done that day showed piecemeal swallowing, slight delay with thin liquid, and gastroesophageal reflux, there was no evidence of laryngeal penetration or aspiration.  (R. at 1210.)  Plaintiff was offered an EGD with dilation, but she declined the procedure.  (R. at 1188.)

On May 7, 2017, Plaintiff presented with chest and stomach pain after a esophageal manometry (R. at 1042), but after no acute findings (R. at 1048, 1055), Plaintiff was released in good condition (R. at 1047).  On May 8, 2017, Plaintiff reported that she was worried that she had an esophageal tear.  (R. at 1034.)  A gastrografin swallow was negative for extravasation; X-rays of the neck and chest were grossly normal and also revealed no evidence of extravasation.

(R. at 1038, 1040, 1041.)  On July 20, 2017, Plaintiff underwent another EGD.  (R. at 1136.)  During that procedure, Maloney and Hurst dilation of feline and distal esophageal strictures was performed with good results and no trauma.  (R. at 1136, 992.)  Biopsied tissue showed mild chronic duodenitis with vascular congestion, mild chronic gastritis, and mild chronic esophagitis with vascular congestion.  (R. at 1155.)  But Plaintiff was negative for histological changes of celiac disease, helicobacter pylori, and eosinophilic esophagitis.  (*Id*.)

On August 8, 2017, Plaintiff reported a sudden onset of chest pain that had resolved on its own.  (R. at 1120.)  Although an esophageal spasm was suspected, testing was done to eliminate cardiac causes.  (R. at 1128.)  Plaintiff underwent another EGD on August 29, 2017, that found mild antral gastritis and reflux esophagitis, but no evidence of strictures, and no dilation was performed during that procedure.  (R. at 691.)  Although Plaintiff reported that she woke up choking on November 20, 2017 (R. at 1101), a neck X-ray was unremarkable (R. at 1107), she felt better after being given a "GI cocktail," and she was discharged in good condition (R. at 1105).  The provider's impression was reflux laryngitis.  (R. at 1105.)

On April 4, 2019, Plaintiff reported chest pain and tightness and shortness of breath.  (R. at 1923.)  After diagnostics resulted in unremarkable or nonacute findings (R. at 1931, 1937), Plaintiff was released in stable condition (R. at 1932).  Questionable mild gastroesophageal reflux was suspected.  (R. at 1937.)  On April 16, 2019, Plaintiff underwent an upper GI endoscopy.  (R. at 1919–20.)  Strictures were not noted.  (*Id*.)  A pathology report generated the following day indicated that Plaintiff had mild chronic gastritis and mild chronic esophagitis with vascular congestion, but her biopsies were negative for eosinophilic esophagitis.  (R. at 2273.)

On December 11, 2019, a GI endoscopy found tight circumferentially folded mucosa in Plaintiff's esophagus, erythematous mucosa in Plaintiff's gastric body and antrum, and a normal duodenal bulb in the second portion of her duodenum. (R. at 2265.) Biopsies found that Plaintiff had mild chronic gastritis but there were no findings of significant pathologies including eosinophilic esophagitis. (R. at 1953.)

An April 28, 2020 GI Progress note indicated that Plaintiff reported eating only pureed foods and choking on food on a regular basis. (R. at 118.) She additionally indicated that she was chronically anemic and hypokalemic due to poor food intake, and she requested a feeding tube. (*Id.*) A review of lab results revealed, however, that Plaintiff's anemia had resolved after she had a hysterectomy. (*Id.*) It does not appear that Plaintiff received a feeding tube.

At a September 24, 2020 follow-up appointment for epigastric/chest pain, there was no sign of a hernia on imaging. (R. at 308.) Plaintiff was started on PPI therapy. (*Id.*) On October 8, 2020, Plaintiff sought treatment for throat pain and nausea that began when she drank water. (R. at 377.) She reported that it felt like a spasm and that such spasms could be addressed with a GI cocktail without lidocaine. (*Id.*) Although Plaintiff was offered testing to rule out cardiac causes, she declined because she was feeling better. (R. at 382.) She was discharged in stable condition. (*Id.*) Similarly, on November 7, 2020, Plaintiff sought treatment for pain in the chest. (R. at 416.) She again indicated that her pain might be due to an esophageal spasm. (R. at 416.) When Plaintiff did not feel better after a GI cocktail, she reported that her pain might be due to a muscle pull that occurred when she was moving heavy boxes the previous day. (R. at 423.) Testing ruled out cardiac causes, and Plaintiff's pain was deemed musculoskeletal in nature. (*Id.*)

On November 12, 2020, Plaintiff had an upper GI endoscopy that showed a normal hypopharynx; esophageal changes suspicious for eosinophilic esophagitis; and benign appearing esophageal stenosis. (R. at 411.) A dilation was performed, and various tissues were biopsied. (*Id*.) A pathology report indicated that the biopsies revealed mild chronic gastritis, moderate chronic active reflux gastroesophagitis, and mild nonspecific active inflammation. (R. at 414.) The report does indicate eosinophilic esophagitis. (*Id*.)

On November 16, 2020, Plaintiff reported that she had a foreign body sensation in her throat and that she felt like water had gotten stuck in her throat until she turned her head. (R. at 397.) Plaintiff indicated that she had a prescription for Carafate but had not yet picked it up. (R. at 403.) She was given a GI cocktail, Benadryl, and steroids, and she reported significant improvement. (R. at 403.) She was released in good condition. (*Id*.)

### b. DVT Issues

On March 20, 2018, Plaintiff presented with a bruise on her left lower extremity and "crampy" pain that she rated as a 2 on a 10-point scale. (R. at 979.) She denied a history of DVT and was ambulatory without issue. (R. at 978.) Upon examination of her lower extremities, Plaintiff had a small ecchymosis on her left lower leg and she complained of calf and popliteal pain with palpitation, but she had no cyanosis, clubbing, or edema, and she had 2+ DP pulses. (R. at 979.) An ultrasound showed no signs of DVT or a Baker's cyst. (R. at 981, 983.)

On September 17, 2018, Plaintiff sought treatment for lower left leg pain. (R. at 834.) She indicated that she had a history of DVT in her lower left leg following a cesarian section. (R. at 841.) An examination found that Plaintiff's lower extremities appeared normal with no cyanosis, clubbing, edema, or calf tenderness, and that Plaintiff had 2+ PT and DT pulses. (R. at

837.)  Plaintiff did, however, have a 2 cm ecchymosis to the lateral side of the left knee.  (*Id*.)

An ultrasound of the left lower extremity showed a partially occlusive thrombus resulting in

incomplete compressibility of the proximal portion of the superficial femoral vein.  (R. at 847.)

It also showed linear echogenicity within the distal left superficial femoral vein that may have

represented minimal thrombus versus intraluminal venous valve.  (*Id*.)  The clinical impression

was DVT.  (R. at 841.)  Plaintiff was started on Xarelto.  (R. at 837, 841.)  She was discharged in

stable condition and advised to follow up with her hematologist.  (*Id*.)

On September 19, 2018, Plaintiff's hematologist noted that she had a new diagnosis of

DVT after a doppler was positive for superficial femoral vein thrombosis.  (R. at 681.)  He

advised anticoagulation for three months or possibly longer, no long travel, immobilization, or

injury.  (R. at 848.)  He also prescribed Xarelto.  (R. at 850.)  On September 20, 2018, Plaintiff

sought treatment for heavy vaginal bleeding that began after she started taking anticoagulants.

(R. at 793.)  Plaintiff's Xarelto was discontinued, and she was started on Lovenox.  (R. at 800.)

During an examination on September 21, 2018, Plaintiff had no calf tenderness.  (R. at 788.)  Her

DVT diagnosis was noted but her condition at discharge that day was good.  (R. at 790.)

On January 20, 2019, Plaintiff sought treatment for chest pain and pain in the back of her

left knee.  (R. at 1536.)  She denied trouble walking.  (R. at 1537.)  A CTA of the chest, labs, and

an ultrasound of the lower left leg were unremarkable for DVT or other acute abnormalities.  (R.

at 1544, 1552.)  During an examination on February 15, 2019, Plaintiff had no calf tenderness.

(R. at 1517.)

On April 10, 2019, Plaintiff sought treatment for left leg bruising and a possible clot.  (R.

at 1736.)  The examination was not suspicious for a clot and her d-dimer test was negative.  (R.

at 1739.) Ultrasounds of Plaintiff's left lower leg on December 18, 2019, June 17, 2020, and September 2, 2020, showed no acute or superficial DVT. (R. at 1950, 2247, 246–47.)

### c. Hypothyroidism

Records date July 25, 2018, indicate that Plaintiff had been diagnosed with primary hypothyroidism when her TSH was elevated in May 2018. (R. at 2322.) At that time, Plaintiff's levothyroxine had been increased to her current dose of 37.5 mg daily. (R. at 2322, 260.) Upon examination in July 2018, Plaintiff's thyroid appeared unremarkable. (R. at 2322.) Plaintiff also reported that she had been diagnosed with a pituitary tumor 15 years prior that had not required surgical intervention, and that her last MRI had been 10 years ago. (*Id.*) An MRI of Plaintiff's pituitary gland and pituitary hormone testing was recommended. (*Id.*)

On June 26, 2020, Plaintiff complained that her levothyroxine made her feel "awful," and therefore, she had discontinued it about one week ago and was currently feeling better. (R. at 27.) Records from a July 7, 2020 televisit consult for her hypothyroidism indicate that Plaintiff had been treating for Hashimoto's thyroiditis but that she had failed to follow up for two years. (R. at 2304.) Plaintiff reported that she had stopped taking her levothyroxine, but after a test done by her PCP in January showed a TSH score of 5.78, and she experienced "brain fog," hot flashes, and dysphagia, she was convinced her to start taking half of a 75mcg tablet every day. (*Id.*) Although she was still not feeling improvement with this dose, her TSH score was 3.26 in May, and her TSP score was 143 in June 2020. (*Id.*) With regard to her pituitary tumor, she reported that she had no recent follow up or brain MRIs, but also had no vision changes or headaches. (*Id.*) Thyroid and pituitary testing was ordered, and Plaintiff was to be switched from levothyroxine to Synthroid after lab results were reviewed. (*Id.*)

At an August 19, 2020 follow-up visit for hypothyroidism, it was noted that Plaintiff's pituitary labs were unremarkable.  (R. at 260.)  Plaintiff's levothyroxine had also been increased after her last visit to 75mcg daily, and she was feeling better on that dose.  (*Id*.)  Although she had been advised to increase her levothyroxine to 200iu a day, that increase was being deferred until after she had a colonoscopy that was scheduled for the near future.  (*Id*.)  Plaintiff's thyroid labs had not yet been redrawn but would be shortly.  (*Id*.)  With regard to her pituitary gland, Plaintiff reported that she had tested positive for carbon monoxide poisoning after a gas leak in her building had been discovered, and that after moving to a new building, she was not experiencing as much shortness of breath and dizziness and was overall feeling much better.  (R. at 260.)  Other records reflect, however, that a venous blood gas test on August 11, 2020, showed that Plaintiff had an elevated carboxyhemoglobin level of 3.4, which might have been due to her status as a smoker, and in any event, was not elevated enough level for treatment.  (R. at 275.)  Plaintiff was referred to a rheumatologist for symptoms of fibromyalgia.  (R. at 325.)  But it does not appear that Plaintiff ever followed up with a rheumatologist.

Records dated September 18, 2020, indicate that Plaintiff's thyroid labs were negative.  (R. at 325.)  Specifically, most recent testing showed that her TSH was 2.52, and her FT3 was 1.13.  (R. at 323.)  It was noted that she was taking 75 mcg of Synthroid twice daily.  (*Id*.)  She was scheduled for a thyroid ultrasound, which took place on September 29, 2020.  (R. at 306.)  The results from that procedure showed isolated subcentimeter TI-RADS category 4 and isolated subcentimeter TI-RADS category 3 nodules within the left lobe.  (*Id*.)  They did not meet the criteria for biopsy/follow up and showed that no follow up was necessary for at least 24 months.  (*Id*.)

### d. Low Back Pain

The record reflects that Plaintiff reported a history of chronic back pain. (*See e.g.*, R. at 1187, 1175, 1088, 1073, 1065, 1044, 1125, 1004, 965, 950, 934 922, 899.) Nevertheless, from February 20, 2017, until May 31, 2017, Plaintiff routinely denied having back pain (R. at 1190, 1174, 738, 1087, 1063) or reported no musculoskeletal symptoms (R. at 1072, 1043). Examinations of Plaintiff's back during this period also found that Plaintiff had no vertebral tenderness (R. at 1073, 1045, 1047) or that her thoracic/lumbar spine was normal (R. at 1423). Plaintiff also denied gait abnormalities on March 7, 2017 (R. at 739), and she denied back or neck pain or limitations to her movement (R. at 738, 730), and was "fully active without restriction" and "ambulatory" to her appointments that day and on April 4, 2017 (R. at 739, 732).

On May 31, 2017, however, Plaintiff sought treatment for abdominal, lower back pain, and left leg pain that had started one day prior while riding in a car. (R. at 1166.) The pain was of moderate severity and Plaintiff was ambulatory. (*Id*.) A back examination found no vertebral tenderness. (R. at 1169.) Plaintiff was discharged in good condition. (R. at 1171.)

Until September 20, 2018, Plaintiff routinely reported no musculoskeletal issues, symptoms, or complaints (R. at 1124, 1003, 933, 898, 864), or back pain (R. 964, 949, 922, 2289), and denied arthralgias (R. at 872). Plaintiff also denied back or neck pain or limitations to her movement (R. at 720, 712, 703, 695, 685) and was "fully active without restriction" and "ambulatory" to appointments on July 6, 2017, October 5, 2017, February 8, 2018, and July 26, 2018 (R. at 720, 721, 713, 705, 694, 695, 685, 686). Plaintiff reported being ambulatory without issue on March 20, 2018. (R. at 978.) Back examinations during this period found that Plaintiff had no vertebral tenderness (R. at 1126, 1005); no vertebral tenderness, decreased range of motion, or muscle spasms (R. at 989); that Plaintiff's back was normal to inspection with no

tenderness to palpitation (R. at 979, ); or that Plaintiff had no vertebral tenderness, decreased range of motion, decreased mass, muscle spasms, leg pain with straight leg raise, or foot drop (R. at 900).  An examination on August 14, 2018, found that Plaintiff had a normal gait and was able to move all four of her extremities.  (R. at 2289.)  An examination on August 17, 2018, likewise found that Plaintiff had normal gait and that her extremities were normal and had full range of motion.  (R. at 873.)  During a September 5, 2018, examination, it was noted that Plaintiff had normal lordosis and range of motion in the cervical and lumbar spine.  (R. at 865.)

But on September 20, 2018, Plaintiff reported a dull back pain starting in her scapula and radiating to her sternum that was a 3/10 in intensity.  (R. at 793.)  An examination on September 21, 2018, found that Plaintiff had a reduced range of motion in the back but normal ranges of motion in her extremities.  (R. at 788.)  On October 1, 2018, however, Plaintiff denied neck and back pain.  (R. at 804.)  And on October 10, 2018, and November 12, 2018, Plaintiff denied neck or back pain or limitation of movement (R. at 677, 670), and she was again "fully active without restriction" and "ambulatory" to her appointments those days (R. at 678, 671).  On December 31, 2018, Plaintiff denied neck and back pain, she had no vertebral tenderness during a back examination, and she was able to ambulate.  (R. at 1556, 1558, 1560.)

On January 10, 2018, Plaintiff complained about joint stiffness and muscle pain.  (R. at 663.)  Nevertheless, upon examination she was "fully active without restriction," and she was "ambulatory" to the appointment.  (R. at 665.)  Plaintiff also denied trouble walking on January 20, 2019.  (R. at 1537.)  On February 15, 2019, Plaintiff reported pain between her shoulder blades that radiated to the middle of her chest.  (R. at 1514.)  But a back examination that day found no tenderness to palpitation.  (R. at 1517.)

From April 1, 2019, until June 26, 2020, Plaintiff reported no musculoskeletal symptoms (R. at 1924, 1990, 1943, 2052, 2113), no musculoskeletal weakness (R. at 1830, 1772), and she denied or reported no neck or back pain (R. at 1816, 2132). Back examinations during this period found that Plaintiff's back was normal to inspection with no tenderness to palpitation (R. at 1832, 1774, 1746, 2084) or that Plaintiff had no vertebral tenderness (R. at 1792, 1758, 1946). A June 6, 2019, examination found that Plaintiff had normal gait. (R. at 1990.) On October 17, 2019, Plaintiff reported that she had no difficulty with ambulation. (R. at 1744.)

On June 26, 2020, Plaintiff reported low back pain radiating into her left buttock and leg that was made better with rest. (R. at 227.) But a musculoskeletal examination found that Plaintiff had no clubbing or spinal deformity, her muscle mass was symmetric, and she had normal range of motion in her arms. (R. at 229.) On July 1, 2020, Plaintiff denied neck and back pain, and a back examination found no vertebral tenderness. (R. at 214, 216.) On July 2, 2020, she denied arthralgias and myalgias. (R. at 2281.) She reported no musculoskeletal symptoms on July 8, 2020, and July 31, 2020 (R. at 194, 288), and back examinations on those dates found no vertebral tenderness (R. at 197, 290). She also denied back pain on August 5, 2020. (R. at 271.)

On August 11, 2020, however, Plaintiff sought treatment for back pain. (R. at 266.) A musculoskeletal examination found no clubbing or gross spinal deformity, symmetric muscle mass, and that Plaintiff's had normal range of motion in her arms. (R. at 268.) She was able to move all four extremities. (R. at 268.) She was given liquid ibuprofen and referred to neurosurgery. (R. at 266.)

Records dated August 24, 2020, indicate that X-rays of Plaintiff's lower spine on June 26, 2020, showed that Plaintiff had good alignment overall with mild degeneration. (R. at 248.)

13

Plaintiff reported that she was currently working as an EMT and that entailed a lot of lifting.  (R. at 24.)  Plaintiff also reported that she had for several years experienced neck pain that radiated bilaterally into her shoulders, but not her arms, and that this pain had gradually worsened.  (R. at 249.)  She further reported lower lumbar pain that radiated down both legs but was greater on the left.  (R. at 250.)  Upon examination, Plaintiff had no spine or joint tenderness, or effusions.  (R. at 251.)  Her muscle tone was intact with no atrophy or abnormal movements, and she had full ranges of motion in the cervical, thoracic, and lumbar spine.  (*Id*.)  She also scored 5/5 on strength tests.  (*Id*.)  Her reflexes were intact and symmetrical.  (*Id*.)  There were no long tract signs, Plaintiff's sensation was intact, and she was able to move all four extremities.  (*Id*.)  She did, however, have tenderness in lumbar spine.  (*Id*.)  Plaintiff's gait was steady but antalgic and she had mild Hoffman's sign bilaterally.  (*Id*.)

Records dated September 21, 2020, indicate that Plaintiff tried physical therapy including traction after her August 24, 2020, appointment, but she reported that physical therapy had made her worse.  (R. at 313, 315.)  Plaintiff also reported that she had been in pain since age 10 and that the pain was better with ibuprofen although not completely gone.  (R. at 314, 315.)  An examination that day resulted in the same findings as the examination on August 24, 2020.  (R. at 316.)  An MRI of Plaintiff's cervical and lumbar spine was recommended.  (R. at 313.)

On September 24, 2020, and September 30, 2020, Plaintiff's reported no abnormal musculoskeletal symptoms.  (R. at 310, 303.)  During an examination on October 8, 2020, Plaintiff had no limited range of motion in her neck.  (R. at 379.)  Records dated October 22, 2020, indicated that an MRI of Plaintiff's cervical spine showed mild spondylosis worse at C4-5 and C5-6, but no severe stenosis.  (R. at 358, 370.)  An MRI of Plaintiff's lumbar spine showed no severe pathology.  (R. at 358–59.)  Plaintiff also reported pain at the bra line.  (R. at 358.)

Plaintiff was referred to a pain clinic for her cervical, lumbar, and bra-line pain and advised to return in three months.  (*Id*.)

At several subsequent examinations, Plaintiff had no limited range of motion in her neck (R. at 356, 349, 419, 400), or vertebral tenderness (R. at 356, 349, 420, 400).  Plaintiff also denied back pain on November 7, 2020.  (R. at 417.)  And she reported no musculoskeletal symptoms on November 16, 2020.  (R. at 398.)

A November 17, 2020, examination found that Plaintiff was in no acute distress.  (R. at 395.)  A lumbar facet loading test was positive on Plaintiff's left and right, while Faber's and Yeoman's tests were positive on Plaintiff's right.  (*Id*.)  Plaintiff also had a positive straight-leg raising test on the left, hyperalgesia to pinprick, and decreased pinprick at the left L4 and L5 dermatomes.  (*Id*.)  But Plaintiff's neck had normal lordosis.  (*Id*.)  And she had normal gait and reflexes.  (*Id*.)  Based on Plaintiff's history, physical examination, and imaging, disc disease at the L4-5 level was determined to be her primary pain generator.  (R. at 392.)  Plaintiff was administered a left L4 and L5 transforaminal epidural steroid injection under fluoroscopy for treatment of her pain.  (*Id*.)

On January 31, 2021, and February 12, 2021, Plaintiff reported no musculoskeletal symptoms (R. at 113, 88), and back examinations those days found no vertebral tenderness (R. at 116, 90.)

### 2.  Consultative Examination

On June 15, 2019, Plaintiff was consultatively examined by Dr. Krupadev, who found the following.  Plaintiff was alert and oriented, in no acute distress or discomfort, and her mental status and behavior were normal during the examination.  (R. at 755.)  Plaintiff had no cyanosis jaundice or lymphadenopathy.  (*Id*.)  Plaintiff had normal ranges of motion in her upper and lower extremities.  (*Id*.)  A musculoskeletal exam showed no muscle weakness or atrophy; no

tenderness with palpitation of the spine and paraspinal muscles; and normal range of motion in the spine. (*Id.*) Plaintiff's gait was satisfactory. (*Id.*) Plaintiff also had normal sensory and motor functions. (*Id.*) Plaintiff scored 5/5 in all areas of muscle strength testing. (R. at 759.) Plaintiff had normal ranges of motion in the cervical spine, shoulders, elbows, wrists, hands-fingers, dorsolumbar spine, hips, knees, and ankles. (R. at 759–62.) Nevertheless, Dr. Krupadev opined that Plaintiff was capable of less than sedentary work due to her multiple medical problems, including her nutritional issues. (R. at 756.)

### 3. State Agency Reviewers

Plaintiff's file was initially reviewed on July 21, 2019, by state agency reviewer Steve E. McKee, M.D. (R. at 469.) Dr. McKee found that Plaintiff had no severe physical impairments. (*Id.*) On December 30, 2019, Plaintiff's file was reviewed on reconsideration by Dr. Diane Manos, who affirmed Dr. McKee's findings. (R. at 487.)

### B. Mental Health Issues

### 1. Treatment Records

Plaintiff sought mental health treatment from Life & Purpose Behavioral Health ("L&P") on August 10, 2017. Plaintiff reported anxiety, depression, and suicidal thoughts. (R. at 765.) Upon examination, Plaintiff was well groomed; thin; with average eye contact and activity; and clear speech. (R. at 773.) Plaintiff had no delusions, or hallucinations and she reported no self-abuse or aggression. (*Id.*) Plaintiff also had a depressed and anxious mood, but full affect, logical thought processes, and cooperative behavior. (R. at 774.) No cognitive impairment was reported. (*Id.*) Plaintiff's estimated intelligence was above average. (R. at 774–75.) Plaintiff had no history of attempts at self-harm, and she posed no current risk of harm to herself or others. (R. at 775.) On August 14, 2017, Plaintiff was diagnosed with major depressive

16

disorder, recurrent moderate, and PTSD, unspecified.  (R. at 764.)  The plan was to prescribe prazosin plus metoprolol and continue counseling.  (*Id*.)

Plaintiff sought mental health treatment on June 19, 2019, when she requested a psychological evaluation from an emergency department for anxiety.  (R. at 1815.)  Upon examination, Plaintiff appeared comfortable, alert, well kempt, well nourished, pleasant, and was speaking full sentences.  (R. at 1816.)  Plaintiff was referred to L&P the following day. (R. at 1821.)  She was discharged in stable condition.  (*Id*.)

Plaintiff did not follow up with L&P for almost six months, until December 10, 2019.  At that time, she reported that she had been struggling with anxiety for several years, especially in social situations, and that she had a melt-down in June and went to the hospital.   (R. at 2166.)  Plaintiff further indicated that therapy had helped when she was attending but that she never took the medication that she had been prescribed because her husband, who did not want her to take the medications, had torn up the prescriptions.  (*Id*.)  But she reported that she was in the process of a divorce and was feeling much stronger emotionally since separating from her husband.  (R. at 2167.)  Upon examination, there were no significant changes in Plaintiff's appearance and behavior, mood/affect, speech, thought processes, thought content, cognition, insight, and judgment.  (R. at 2171–72.)  She was assigned a GAF score of 68.  (R. at 2175.)

On January 23, 2020, the records from L&P indicate that "some progress was demonstrated."  (R. at 2179.)  Plaintiff again reported that she had previously improved with treatment.  (*Id*.)  Upon examination, there was no significant change in Plaintiff's appearance and behavior, mood/affect, speech, thought processes, thought content, cognition, insight, and judgment.  (R. at 2180.)  On March 19, 2020, slight progress was noted.  (R. at 2190.)  Plaintiff

reported some improvement in anxiety although she still had on-going issues with depression. (*Id*.)  An examination again found no significant changes in Plaintiff's mental status.  (*Id*.)

Records from a televisit on June 24, 2020, indicate that there was no evidence that Plaintiff had any cognitive impairment.  (R. at 2197.)  Plaintiff sounded strikingly, though not inappropriately, cheerful, even when discussing sad things.  (R. at 2200.)  Plaintiff had normal rate and volume to her speech, and she was articulate, cooperative, and had an appropriate attitude.  (R. at 2210.)  With regard to her attention span, Plaintiff was alert, oriented to time, place, and person, and no problems were noted with her recent or remote memory or knowledge fund.  (R. at 2211.)  Plaintiff's mood was calm, her affect alert, and she was appropriate to the situation.  (*Id*.)  Plaintiff also had improved judgment and insight.  (R. at 2212.)  Her thought processes were normal, and she had clear thought content.  (*Id*.)  Although her abstract reasoning, associations, and computation skills were not assessed, no problems in those areas were noted.  (*Id*.)

On July 22, 2020, Plaintiff reported to L&P that her sleep had improved.  (R. at 2221.)  Plaintiff had also started painting pictures and was good at it and was sewing.  (*Id*.)  She and her husband would sometimes go walking for exercise.  (*Id*.)  Good progress was reported.  (R. at 2222.)  Plaintiff had appropriate speech with normal tone, rate, and volume.  (R. at 2224.)  Her thought processes were coherent, logical, and appropriate.  (R. at 2225.)  Her thought content was also intact.  (*Id*.)  Her recent memory was rated: "good recall."  (R. at 2226.)   No problems with lack of focus were noted regarding her attention and concentration.  (*Id*.)  Plaintiff's language was also articulate and fluent, and she had direct eye contact.  (R. at 2226, 2227.)

## 2.  Consultative Examination

Plaintiff was consultatively examined by Dr. Wade on June 24, 2019.  (R. at 742–47.)

18

Dr. Wade opined all of the following. Plaintiff's performance on a brief word reasoning task was not suggestive of difficulty understanding instructions. (R. ay 746.) Plaintiff's performance on a brief short-term memory task was not suggestive of difficulty remembering instructions. (*Id*.) Plaintiff did not have difficulty understanding and responding to questions posed during her examination, and she did not report problems learning work tasks. (*Id*.)

Regarding Plaintiff's abilities and limitations in sustaining concentration and persisting in work-related activity at a reasonable pace, Plaintiff was able to follow the conversation during the interview and did not ask for regular repetition of questions. (*Id*.) Plaintiff adequately completed tasks which assessed attention during the evaluation. (*Id*.) Plaintiff's level of energy was below average on the day of the examination, however, and problems with her motivation were noted. (R. at 746–47.) Plaintiff also reported a history of concentration problems in work settings that negatively affected completion of work duties. (R. at 747.)

Plaintiff did not present with indications of mental health difficulties which would clearly impact her interactions in work settings. (R. at 747.) Plaintiff did not report problems with social interaction which affected her activity level. (*Id*.) Plaintiff did not present with intellectual limitations that would impact her ability to understand and respond to supervisory feedback. (*Id*.) Plaintiff did not report significant problems with social interaction in work settings. (*Id*.)

Plaintiff also did not present with indications of mental health difficulties that would clearly impact her ability to manage pressure in work settings. (*Id*.) Plaintiff's presentation was not indicative of intellectual or cognitive limitations, which would impact her ability to manage normal work pressures. (*Id*.) Plaintiff, however, reported problems managing pressure as an EMS worker, which had contributed to intrusive thoughts and distraction. (*Id.*)

### 3.  State Agency Reviewers

Plaintiff's file was initially reviewed on July 12, 2019, by state agency reviewer, Katherine Fernandez, Psy.D. who made all of the following findings.  (R. at 473.)  Plaintiff was limited to tasks that require infrequent social contact with customers and coworkers.  (*Id*.)  Plaintiff was also limited to tasks that requires infrequent changes and no strict production quotas.  (*Id*.)  Plaintiff's file was reviewed on reconsideration by Irma Johnston, Psy.D.  (R. at 491.)  Dr. Johnston affirmed Dr. Fernandez's findings but additionally found that Plaintiff was limited to simple, repetitive one-to-two step tasks, in settings where the pace is not fast.  (R. at 490.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.     ANALYSIS

As noted, Plaintiff raises the following contentions of error: (1) the ALJ erred by finding that she had no severe physical impairments at step two; and (2) the ALJ erred by failing to incorporate into Plaintiff's RFC all the mental limitations found by the state agency reviewers. Both contentions of error lack merit.

## A.     The ALJ's Determination that Plaintiff had no Severe Physical Impairments

Plaintiff contends that the ALJ erred when failing to find that Plaintiff's physical impairments were not severe. This assertion is without merit.

At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational requirement. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012). The United States Court of Appeals for the Sixth Circuit has construed a claimant's burden at step two as "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The inquiry is therefore "employed as an administrative convenience to screen out

claims that are 'totally groundless' solely from a medical standpoint." *Id*. at 863 (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985).

Where, however, the ALJ determines that a claimant has a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence. *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 416.945(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in the RFC assessment); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

Here, the ALJ found that Plaintiff had the following severe mental impairments: posttraumatic stress disorder (PTSD); anxiety disorder; and major depressive disorder. (R. at 13.) The ALJ also found that Plaintiff's medically determinable physical impairments— esophagitis with strictures, dysphagia, DVT, anemia, hypothyroidism, hypertension, gastritis, low back pain, and restless leg syndrome—were not severe. (R. at 13–15.)[4] Thus, the pertinent question is whether the ALJ properly considered any limiting effects caused by those non-severe physical impairments when she assessed Plaintiff's RFC.

Plaintiff asserts that the ALJ "simply disregarded [Plaintiff's] limitations after determining that they were non-severe." (ECF No. 13, PageID # 2415.) But even a cursory

---

[4] The ALJ also found that there were no objective findings or diagnoses of fibromyalgia and chronic fatigue syndrome in the record, and therefore, they were not medically determinable impairments. (R. at 15.) Plaintiff does not challenge that determination.

review reveals that the ALJ explicitly considered Plaintiff's non-severe physical impairments. For instance, while assessing Plaintiff's RFC, the ALJ wrote: "As previously discussed, the claimant has no evidence of severe physical impairments, thus there is no basis for such extreme limitations in lifting, standing, walking, or even sitting as alleged." (R. at 18.)  At another point in the RFC assessment, the ALJ wrote: "However, the claimant stated that she spent a great deal of time completing household chores, citing compulsive cleaning, which is inconsistent with the severity of physical complaints alleged." (*Id*.)  The ALJ also reasoned that Plaintiff's physical activities belied her alleged physical limitations in the RFC assessment.  The ALJ wrote:

> Furthermore, the information in the record indicates the claimant functions at a higher level than alleged psychologically, and *even physically*. For example, the claimant testified it has been two years since she drove, but on a questionnaire completed on April 27, 2019, she reported that when going out, she drove a car. The claimant further indicated that she fed and played with her animals. She indicated she prepared her own food. The claimant noted that she shopped in stores and by computer. She stated she was able to pay bills and use a checkbook. The claimant reported she went to her son's wrestling once a month. She indicated she was able to finish things she started (Exhibit 3E). On June 24, 2019, the claimant reported to Dr. Ward that her EMT job ended a year ago, but she continued to volunteer once a month (Exhibits 3F, p.3). On January 23, 2020, the claimant indicated that she enjoyed gardening, reading, and making jewelry. She stated she was writing a book (Exhibit 8F, p.22). As recently, as July 22, 2020, the claimant reported that her and her husband went walking sometimes for exercise (Exhibit 9F).

(R. at 20.) (emphasis added).  Finally, but significantly, when assessing Plaintiff's RFC, the ALJ also explained that the state agency reviewers at the initial and reconsideration levels both found that Plaintiff had no severe physical impairments (and thus, no physical limitations) and that these findings were persuasive because Plaintiff had "numerous physical complaints, but the conditions resolved or are effectively treated resulting in no more than minimal limitations in functioning." (R. at 20–21.)  In short, the ALJ clearly considered Plaintiff's physical

impairments when she assessed Plaintiff's RFC.  The ALJ, however, determined that those non-severe physical impairments did not result in physical limitations.

The undersigned further finds that substantial evidence supports the ALJ's determination that Plaintiff's non-severe physical impairments did not result in physical limitations.  First, as the discussion above indicates, the ALJ explained that Plaintiff's household chores and daily activities demonstrated that she had greater physical capabilities than she alleged.  (R. at 18, 20.)  The record substantially supports that explanation.  As the ALJ accurately noted, Plaintiff testified on September 10, 2020, that she had not driven for two years (R. at 449), but less than two years prior, on April 27, 2019, Plaintiff indicated that when she went out, she drove a car (R. at 608).  Additionally, in response to a question asking: "If you don't drive, explain why not."  Plaintiff replied "n/a."  (R. at 608.)  On April 27, 2019, Plaintiff also indicated that she fed and petted her animals, shopped twice a month, attended her son's wrestling events once a month, and could walk a quarter mile before stopping to rest for 10 minutes.  (R. at 606, 608, 609.)

The ALJ also correctly noted that during a June 24, 2019 consultative mental health examination with Dr. Ward, Plaintiff indicated that she "often [spent] a great deal of time completing household chores citing compulsive cleaning."  (R. at 744.)  At that same examination, Plaintiff told Dr. Ward that she was able to attend to grooming and hygiene without difficulty, and that although she was had difficulty shopping because of anxiety, she had no difficulties preparing meals.  (R. at 744.)  As the ALJ also noted, on July 22, 2020, Plaintiff reported that "[s]he and her husband go walking sometimes for exercise."  (R. at 2221.)

In addition, the ALJ rightly pointed out that on June 24, 2019, Plaintiff told Dr. Ward that she volunteered as an EMT once a month, although she reported that she mostly sat when volunteering.  (R. at 744.)  The undersigned additionally notes, however, that Plaintiff also

24

regularly reported working as an EMT or a housecleaner after February 20, 2017, the alleged

date of onset.  For instance, on March 31, 2017, Plaintiff reported that she worked full time as an

EMT.  (R. at 737.)  Plaintiff reported that she did work cleaning from "2017–2018" on a form

that she completed on April 27, 2020.  (R. at 651.)  Plaintiff also reported that she was employed

as a housecleaner on all the following dates: July 25, 2018, August 2, 2018, August 14, 2018,

August 17, 2018, September 5, 2018, March 21, 2019, March 26, 2019, and June 6, 2019.  (R. at

2320, 2034, 2287, 871, 863, 1505, 1498, 1989, 1975.)  On June 4, 2020, Plaintiff reported that

she was not working, not because of her ailments, but because of the pandemic and that even so,

she worked as an EMT at wrestling events.  (R. at 2196.)  Indeed, it does not appear that Plaintiff

reported to any healthcare providers that she was unemployed until November 7, 2020.  (R. at

419.)  The record reflects that even after that date, however, Plaintiff continued to engage in at

least some physical activities.  On November 7, 2020, Plaintiff sought treatment for chest pain

after she pulled a muscle lifting heavy boxes.  (R. at 423.)  And as the ALJ noted, on January 23,

2021, Plaintiff reported that she enjoyed gardening.  (R. at 2185.)

  Second, the ALJ also explained that the state agency reviewers both determined that

Plaintiff had no severe physical impairments (and thus, that she had no physical limitations) and

that those findings were persuasive because the record reflected that Plaintiff's physical

conditions were resolved or effectively treated resulting in no more than minimal limitations.  (R.

at 20–21.)  Substantial evidence supports that determination too—the state agency reviewers

indeed found that Plaintiff did not have severe physical impairments, and thus, they did not find

that Plaintiff had any physical limitations.  (R. at 469, 487.)

  The record also supports the ALJ's determination to credit the state agency reviewers'

findings because Plaintiff's physical conditions were resolved or effectively treated.  For

instance, the record reflects that Plaintiff received treatments for her GI issues including EGD procedures with dilations in July 2017 and November 2020 for her esophagitis with strictures and benign appearing esophageal stenosis.  (R. at 1136, 992, 411.)  Biopsies taken during those procedures revealed only mild or moderate issues.  (R. at 1155, 414.)  After the November 2020 procedure, Plaintiff was effectively treated for a foreign body sensation in her throat with a GI cocktail after she failed to fill her Carafate prescription.  (R. at 403.)  And it does not appear that Plaintiff sought treatment for her GI issues after that date.

To the extent Plaintiff also asserts that her GI issues caused her to experience drastic weight loss and anemia, examiners routinely noted that Plaintiff appeared to be well nourished. (R. at 1436, 1063, 837, 1517, 1832, 1990, 1816, 1774, 1746, 2046, 228, 268, 261, 251, 324, 316, 311, 361.)  Although some examinations noted that Plaintiff appeared thin (R. at 1080, 1125, 773, 2053, 788, 272, 245, 379) or lean (R. at 1150), her body habitus also appeared average to examiners (R. at 1436, 2035, 2289, 1990, 2302) or she appeared to be of normal weight (R. at 805).  Moreover, based on her height and weight, Plaintiff's BMI was routinely in the normal range.  (*See e.g.*, R. at 738, 1147, 719, 711, 702, 2318, 694, 2032, 2324, 2285, 869, 861, 684, 794, 676, 663, 1503, 1987, 751, 1980, 1973, 2049, 1958, 2069, 2237, 2063, 2056, 2043, 2278, 268, 257, 319, 316, 311, 372, 361.)  The record further reflects that Plaintiff's anemia—which was described as moderate (R. at 736, 728, 717), mild (R. at 709, 700, 994, 690), or slight (R. at 810)—was not due to poor food intake but was instead attributed to her menorrhagia (R. at 682, 688) and that it resolved after she had a hysterectomy (R. at 118).

Plaintiff's DVT was also effectively treated.  Plaintiff was initially prescribed Xarelto after being diagnosed with DVT in her left lower leg in September 2018.  (R. at 837, 841, 848, 850.)  She was switched to Lovenox after she had issues with Xarelto (R. at 800), and three

subsequent ultrasounds of her left leg were negative for DVT (R. at 1950, 2247, 246–47.)

Similarly, Plaintiff was diagnosed with hypothyroidism in 2018 (R. at 2322), but she failed to

follow up with treatment for that condition for two years (R. at 2304). After she resumed

treatment and her medication was adjusted, Plaintiff's thyroid labs normalized (R. at 260, 325,

323), and a thyroid ultrasound showed that she did not require follow up for at least two years

(R. at 306.)

     Plaintiff's lower back issues also resolved or were effectively treated. Plaintiff regularly

denied or reported no neck or back pain. (*See e.g.*, R. 1190, 1174, 738, 1087, 1063, 783, 730,

964, 949, 922, 2289, 804, 677, 670, 1816, 2132, 214, 216, 271.) Examinations also regularly

found that her back was normal or that she had no vertebral tenderness. (*See e.g.*, R. at 1073,

1045, 1047, 1423, 1126, 1005, 989, 979, 900, 1558, 1832, 1774, 1746, 2084, 1792, 1758, 1946,

197, 290.) Even when Plaintiff did experience back pain, examination results were often benign.

For instance, when Plaintiff sought treatment for back pain on May 31, 2017, and February 15,

2019, examinations found that she had no vertebral tenderness. (R. at 1169, 1517.) When

Plaintiff sought treatment for back pain on June 26, 2020, and August 11, 2020, (R. at 227, 266),

musculoskeletal examinations found that she had no clubbing or spinal deformity, her muscle

mass was symmetric, and she had normal range of motion in her arms (R. at 229, 268). Imaging

in Fall 2020 also indicated that Plaintiff had mild spondylosis in her cervical spine but no severe

stenosis, and that her lumbar spine had no severe pathology. (R. at 358–59, 370.) And although

the records indicate that Plaintiff reported that physical therapy worsened her back-pain issues

(R. at 313, 315), she was referred to a pain clinic for cervical, lumbar, and bra-line pain on

October 22, 2020, and treatments there appeared to have addressed her issues. (R. at 358.)

Specifically, on November 17, 2020, Plaintiff received a left L4-L5 steroid injection. (R. at

392.) Plaintiff subsequently reported no musculoskeletal symptoms (R. at 113, 88), and back examinations found that she had no vertebral tenderness (R. at 116, 90).

Moreover, examiners routinely noted that Plaintiff was "fully active without restriction" (R. at 739, 731, 720, 713, 704, 694, 685, 678, 670, 665, 2239); Plaintiff's neck had no movement limitations, full range of motion, or could be moved freely without issue (R. 329, 379, 356, 349, 419, 400, 403); Plaintiff could move all of her extremities or she had full ranges of motion in her extremities (R. 1187, 1175, 1088, 1073, 1169, 1126, 2036, 2290, 873, 865, 1558, 1539, 1926, 1792, 1758, 1977, 1946, 2073, 2067, 2115, 2060, 216, 197, 290, 356, 349, 420, 400, 116, 104, 577, 44); Plaintiff scored 5/5 on strength tests or her strength was intact (R. at 759, 1746, 251, 316); and Plaintiff's gait was normal or steady or satisfactory (R. at 1136, 2289, 873, 1991, 775, 251, 316, 361, 395).

Plaintiff nevertheless asserts that the ALJ's determination is not supported by the record. In so doing, she points to other record evidence, including records reflecting her physical symptoms and a report from consultative examiner Dr. Krupadev opining that she had physical restrictions. (ECF No. 13, PageID # 2413–14.)[5] But "[a]s long as substantial evidence supports the Commissioner's decision, we must defer to it, even if there is substantial evidence in the record that would have supported an opposite conclusion." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citations omitted). Such is the case here.

In sum, the undersigned finds that the ALJ did not commit reversible error. The ALJ considered Plaintiff's non-severe physical impairments when assessing Plaintiff's RFC but found

---

[5] Plaintiff does not challenge the ALJ's assessment that Dr. Krupadev's opinion was only partially persuasive, and has therefore, waived any such challenge.

that they did not result in physical restrictions.  Substantial evidence supports that determination.

Therefore, Plaintiff's first contention of error lacks merit.

**B.      Incorporation of Some, But Not All, of the Mental Limitations Found by the State Agency Reviewers**

Plaintiff also asserts that the ALJ erred by failing to incorporate certain mental limitations found by the state agency reviewers into her RFC.  This assertion lacks merit.

Because Plaintiff's claim was filed after March 27, 2017, her application is subject to newer regulations governing how an ALJ must evaluate evidence.  *See* 20 C.F.R. § 416.920c.  Under those regulations, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s)[6] including those from [the claimant's] medical sources." 20 C.F.R. § 416.920c(a).  Instead, an ALJ must consider the following five factors when evaluating the persuasiveness of medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the Social Security Administration's] disability programs policies and evidentiary requirements."  § 416.920c(c)(1)–(5).  Of the five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. § 416.920c(b)(2).  Although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so.  *Id*.  If, however, an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the

---

[6] A prior administrative finding is defined as a finding about a medical issue made by a Federal or State agency medical or psychological consultant at a prior level of review. *See* § 416.913(a)(5).

record . . . but are not exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive factors . . . ."  § 416.920c(b)(3).  In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each opinion individually.  § 416.920c(b)(1).  Instead, the ALJ may "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id.*

The regulations also explain the "supportability" and "consistency" factors that must be articulated:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 416.920c(c)(1)–(2).  In practice, this means that the supportability factor "concerns an opinion's reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence." *Reusel v. Comm'r of Soc. Sec.,* No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021).  And the consistency factor relates to an opinion's congruence with evidence from other sources, including other medical sources. § 416.920c(c)(2).

Here, the ALJ summarized the state agency reviewers' findings as follows:

> The State agency psychological consultants who reviewed the record on July 12, 2019, and December 31, 2019, indicated the claimant was able to perform simple, repetitive one to two step tasks. The claimant was able to perform tasks that required infrequent social contact with customers and coworkers. She was able to perform tasks that required infrequent changes and no strict production quotas (Exhibits 1A and 3A).

(R. at 21.) The ALJ then determined that those findings were only partially persuasive and articulated why she arrived at that conclusion.

> This opinion is partially persuasive, as the objective findings noted by Dr. Ward, as well as those reflected in mental health records from L & P, does indicate the claimant must not have work that involves assembly line, production rate pace, or quotas. The claimant is also capable of tolerating a few changes in the work routine defined as three to four changes per workday or work shift (Exhibits 3F, 5F, 8F, and 9F).

(*Id*.)

As this discussion demonstrates, the ALJ did not expressly use the terms supportability or consistency. Nevertheless, the ALJ explained that objective findings from other sources— consultative examiner Dr. Ward and L&P— validated some of the state agency reviewers' findings. Specifically, that Plaintiff was not capable of work involving assembly line, production rate pace, or quotas, and that Plaintiff could tolerate a few changes in work routine. (*Id*.) That articulation is consistent with the regulations, which provide that supportability relates to a finding's reference to objective evidence and that consistency relates to a finding's congruence with evidence from other sources.

Plaintiff specifically complains, however, that the ALJ did not incorporate into Plaintiff's RFC two of the state agency reviewers' other findings— a limitation to simple repetitive one and two step tasks and infrequent social contact with customers and coworkers. (ECF No. 13, at PageID # 2419.) But "[e]ven where an ALJ provides "great weight" to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ

required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  Accordingly, the ALJ was not required to include these other limitations in Plaintiff's RFC.

Plaintiff appears to assert, however, that the ALJ should have provided more explanation about why she did not incorporate these other two limitations.  (ECF No. 13, PageID # 2419.) The undersigned agrees that although the new regulations are less demanding than the former rules governing the evaluation of medical opinions and prior administrative findings "they still require that the ALJ provide a coherent explanation of his reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.*, No. 20-1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021).  As one Court recently explained,

> The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)).  An "ALJ's failure . . .  to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

*Hardy v. Comm'r of Soc. Sec.*, No. 20-101918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021).  That standard was met here.  The ALJ indicated that the state agency reviewers' findings were only partially persuasive, and she adopted some, but not all, of them.  The ALJ also found elsewhere in the determination that that Dr. Wade's opinion was persuasive.  (R. at 18–20.)  That provided a sufficient rationale for this Court's review—Dr. Wade's opinion was less restrictive than the findings from the state agency reviewers (*i.e.*, D. Wade did not opine that Plaintiff was limited to simple, repetitive one-and-two step tasks and infrequent social contact with customers and coworkers), and the ALJ found that Dr. Wade's opinion was more persuasive the state agency reviewers' findings.  *Hill v. Comm'r of Soc. Sec*., 560 F. App'x 547, 551 (6th Cir. 2014) (noting that an ALJ's determination should be read as a whole).

Although Plaintiff does not directly challenge the ALJ's determination that Dr. Wade's opinion was persuasive, the undersigned finds that substantial evidence supports that determination.  The ALJ summarized Dr. Wade's mental status examination findings as follows.

> On mental status, Dr. Ward noted the claimant did not display loose associations, flight of ideas, or delusional beliefs. He stated the claimant's level of understanding was adequate as no rephrasing of questions was required. Dr. Ward indicated the claimant presented as primarily anxious, but maintained consistent eye contact during the interview. He noted the claimant displayed limited energy to complete the evaluation process, appearing tired, but she did not have excessive complaints of fatigability or pain. The claimant recalled personal historic information without significant difficulty. She recalled four digits forward, six digits backward, and three out of three words after a brief delay. When asked to count backward from 100 by 7 in 30 seconds, the claimant completed two iterations accurately with two errors. When asked to count backward from 20 by 3, the claimant completed six iterations with no errors in 16 seconds. She was able to accurately calculate basic math values including one-quarter of 200 and six quarters, but was not able to calculate 24/3. Dr. Ward stated the claimant's level of intellectual functioning appeared to fall within normal limits based on today's presentation. He found the claimant had diagnoses of PTSD and major depressive disorder.

(R. at 18–19.)  The ALJ then summarized Dr. Ward's opinions.

Dr. Ward opined that the claimant's performance on a brief word reasoning task

33

was not suggestive of difficulty understanding instructions. He noted the claimant's performance on a brief short term memory task was not suggestive of difficulty remembering instructions. Dr. Ward indicated the claimant did not have difficulty understanding and responding to questions posed during the examination today. He stated the claimant did not report problems learning work tasks. Dr. Ward noted regarding the claimant's abilities and limitations in sustaining concentration and persisting in work-related activity at a reasonable pace, she was able to follow the conversation during the interview and did not ask for regular repetition of questions. Dr. Ward indicated the claimant adequately completed tasks which assessed attention during the evaluation. He noted the claimant's level of energy was below average today and problems with motivation were noted. Dr. Ward stated the claimant did not present with indications of mental health difficulties which would clearly impact interaction in work settings. He noted the claimant did not report problems with social interaction which affects activity level. Dr. Ward indicated the claimant did not report significant problems with social interaction in work settings. He stated the claimant did not present with indications of mental health difficulties which would clearly impact her ability to manage pressure in work settings. Dr. Ward noted the claimant's presentation was not indicative of intellectual or cognitive limitations, which would impact her ability to manage normal work pressures (Exhibit 3F).

(R. at 19.)  The ALJ then explained that Dr. Wade's opinion was persuasive.  The ALJ wrote:

The opinion of Dr. Ward is persuasive, as he based the limitations on the claimant's objective findings during evaluation, as well as her mental health treatment history. The undersigned considered the claimant's problems with motivation related to her mental health conditions, as well as her complaints regarding deficiencies in ability to adapt, by finding that she must not have work that involves assembly line, production rate pace, or quotas. Furthermore, the claimant is capable of tolerating only a few changes in the work routine defined as three to four changes per workday or work shift. However, the evidence reflects stability of the claimant's mental health conditions with conservative treatment. For instance, on September 13, 2019, the claimant had normal mood and affect (Exhibit 6F, p.998). During a diagnostic assessment update on December 10, 2019, the claimant noted that therapy was helping when she used to come to the facility, but she never took the medication prescribed because her husband tore up the prescription. She stated she felt stronger emotionally since separating from her husband and would like to reestablish services with L & P (Exhibit 8F). A family practice note dated January 15, 2020, reveals the claimant reported she had started going to counseling at L & P. The claimant had complaint that her mind raced at night and interfered with her ability to sleep. However, on evaluation, the claimant had grossly normal mental status, including mood, affect, thought process, and judgment (Exhibit 7F, p.99). During examination on February 28, 2020, the claimant again had normal mood and affect (Exhibit 7F, p.180).

During a telephone session at L&P on March 19, 2020, the claimant reported

improvement in anxiety, even though she was trying to help multiple family members and friends who were staying with her. She indicated she had some issues with depression and noted her wedding was postponed due to COVID 19. The claimant underwent a psychiatric evaluation by telephone on June 4, 2020, and reported she was to be married on June 13, 2020. She stated she had three adult children and was homeschooling her 17 year old, who would be a senior in the fall. The claimant reported nightmares, insomnia, daytime fatigue, depression, and worry. On evaluation, the claimant had no evidence of cognitive impairment and sound cheerful. The claimant was articulate and cooperative with appropriate attitude. She had no problem with memory or fund of knowledge. The claimant had improved insight and judgment. She was prescribed Prazosin and Doxepin (Exhibit 8F). On July 22, 2020, the claimant reported her sleep was improved. She stated she had started painting pictures and was good. The claimant indicated she also sewed. She was described as having good progress (Exhibit 9F).

(R. at 19–20.)

As this discussion demonstrates, the ALJ explained that Dr. Ward's opinion was persuasive because it was based on his examination findings and Plaintiff's mental health treatment history.  Substantial evidence supports that determination because it accurately describes the bases for Dr. Wade's opinions—Dr. Wade explicitly and accurately referred to his examination results and information relayed to him by Plaintiff.

In addition, the ALJ determined that Dr. Ward's opinion was persuasive because evidence from other providers demonstrated that Plaintiff's mental health issues were stable with conservative treatment.  That too is supported by substantial evidence.   As the ALJ accurately noted, records from L&P Services dated December 10, 2019, indicated that Plaintiff reported that therapy was helpful to her when she attended, but that she had not taken her prescribed medications because her husband prevented her from doing so.  (R. at 2166.)   She also reported that she was in the process of divorcing her husband and that she felt stronger emotionally as a result.  (R. at 2167.)

The ALJ also accurately explained that after Plaintiff resumed treatment with L&P Services in December 2019, examinations showed improvement or stability.  For instance, as the

ALJ noted, an examination on January 15, 2020, found that Plaintiff's appearance and mental status were grossly normal; her speech, movement, mood, affect, thought processes, and thought content were normal; and that her judgment was good.  (R. at 2053.)  Some progress was also noted on January 23, 2020.  (R. at 2179.)  On February 28, 2020, Plaintiff's mood and affect were normal.  (R. at 2134.)  On March 19, 2020, slight progress was noted.  (R. at 2190.)  On June 4, 2020, records from L&P indicated that Plaintiff had no evidence of cognitive impairment.  (R. at 2197.)  Plaintiff also sounded strikingly but not inappropriately cheerful that day.  (R. at 2200.)  She had normal rate and volume to her speech, and she was articulate, cooperative, and had an appropriate attitude.  (R. at 2210.)  With regard to attention span, Plaintiff was also alert, oriented to time, place, and person, and no problems were noted with her recent or remote memory or fund of knowledge.  (R. at 2211.)  Plaintiff's mood was calm, her affect alert, and she was appropriate to the situation.  (*Id*.)  She had improved judgment and insight, her thought processes were normal, and she had clear thought content.  (R. at 2212.)  Although her abstract reasoning, associations, and computation skills were not assessed, no problems with these areas were noted.  (*Id*.)

Notes from L&P dated July 22, 2020, also indicated that "good progress was reported." (R. at 2222.)  Plaintiff had appropriate speech with normal tone, rate, and volume.  (R. at 2224.) Her thought processes were coherent, logical, and appropriate and her thought contact was intact. (R. at 2225.)  Plaintiff's recent memory was rated as "good recall," and no problems with lack of focus were noted with regard to her attention and concentration.  (R. at 2226.)  Her language was articulate and fluent.  (*Id*.)  Plaintiff also had direct eye contact.  (R. at 2227.)

In short, the undersigned finds that the ALJ did not commit reversible error.  The ALJ determined that the state agency reviewers' findings were only partially persuasive while Dr.

Wade's opinion was persuasive, and therefore, the ALJ adopted only some of the state agency reviewers' findings.  The ALJ's assessment of the state agency reviewers' findings and Dr. Wades opinion was supported by substantial evidence.  Plaintiff's second contention of error therefore lacks merit.

## VI.    RECOMMENDED DISPOSITION

For all the foregoing reasons, Plaintiff's contentions of error are not well taken. Accordingly, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's non-disability determination is **AFFIRMED**.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE